The STATE of Ohio, Appellee,

v.

MISCH, Appellant.

[Cite as *State v. Misch* (1995), 101 Ohio App.3d 640.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–94–016.

Decided March 10, 1995.

*Anthony G. Pizza,* Lucas County Prosecuting Attorney, and *John J. Weglian,* Assistant Prosecuting Attorney, for appellee.

*Jeffrey M. Gamso,* for appellant.

SHERCK, Judge.

This appeal comes to us from a judgment of conviction and imposition of sentence issued by the Lucas County Court of Common Pleas following the return of a jury verdict in which appellant was found guilty of aggravated murder and aggravated robbery. We affirm the convictions because the evidence was sufficient to support the verdicts and the verdicts were not inconsistent. In addition, our review indicates that the trial court did not commit prejudicial error.

On August 4, 1992, the beaten body of Vernon E. Huggins, a black male, was discovered by two area residents in a Toledo city park. As a result of a crime stopper call, the police obtained information linking appellant, Eric Misch, to the murder. On February 2, 1993, two police detectives went to appellant's home; there, the detectives read appellant his *Miranda* rights. Appellant, then sixteen years old, and his mother executed a written waiver of these rights. After appellant and his mother consented to the questioning of appellant without her being present, the detectives took appellant to the downtown police station. Upon first being questioned, appellant denied any knowledge of the murder. However, after detectives told appellant that two members of his gang had linked him to the murder, appellant admitted his involvement in the beating.

The officers then drove appellant to Wilson Park, which was the scene of the murder. The officers arrived at the park by following appellant's detailed directions as to the route the gang members took the night of the murder. At the park, appellant pointed out several areas relevant to where the attack and beating took place. In addition, appellant described actions taken by the gang.

The detectives then returned appellant to the station where he made a taped statement. In that statement, appellant said that he had been with several members of a gang called the Bishops. He was with the Bishops on a night approximately three and one-half weeks prior to August 29, 1992. That particular night the group had been to a party at the home of a girl named Lisa. Appellant stated that he and two other gang members left the party for a while, meeting up with two more members at a nearby cemetery. The group then walked over to Woodward High School. Once there, they continued walking into Wilson Park, where they saw a young black man who was walking across the park. Appellant described the man as a little taller than himself, with hair that "faded up" with "poofy curls on top." According to appellant, one of the members said, "Let's jack this dude." Appellant explained that this meant that the gang was going to rob the man. Appellant's role was to approach the man and ask him for either a cigarette or the time for the purpose of distracting him and slowing him down. When appellant carried out his part of the plan, the other members attacked the man, kicking and beating him for about two minutes. The gang then ran away from the scene and returned to Lisa's house at about 1:30 a.m.

Appellant stated that, once back at the house, a girl named Michelle asked one of the boys what they had done because two of the gang members had blood stains and spatters on their pants. The boy told her not to worry about it. At the end of his statement, appellant said that he had made the statement voluntarily and everything that he had said was "100 per cent" true. Appellant also agreed to testify against the other perpetrators at a grand jury hearing.

Two days later, appellant recanted his statement and denied any involvement in the Wilson Park incident. Because of his age at the time of the incident, appellant was originally charged under the juvenile delinquency statutes. However, transfer proceedings pursuant to R.C. 2151.26 and Juv.R. 30 were held by the Lucas County Court of Common Pleas, Juvenile Division, to determine whether appellant should be tried as an adult. The juvenile court granted the state's request and transferred appellant for prosecution to the General Division of the Lucas County Court of Common Pleas. On July 2, 1993, the grand jury returned an indictment of two counts against appellant. Appellant was indicted for aggravated murder in violation of R.C. 2903.01(B), with specifications of aggravating circumstances in violation of R.C. 2929.04(A)(7) and 2941.14. Appel-

lant was also indicted on a charge of aggravated robbery in violation of R.C. 2911.01(A)(2). At trial, the jury heard appellant's taped statement, as well as the following evidence.

Detective Anderson and Detective Leiter of the Toledo Police Division testified that appellant voluntarily made his statement after being apprised of his *Miranda* rights. Anderson also identified a wooden club which had been turned over to him by a friend of one of the gang members.

Other police officers testified as to the position of the body, the description of the murder scene at Wilson Park, and the procedures the officers used to investigate the crime. The officers testified that the victim's body was found lying in the grass, near a storage building and group of trash barrels. One officer described the victim's hair style as being built up and higher on the top.

Another witness, Michelle Parkhurst, testified that she was a member of the Bishops and had been present at a party in Lisa's house the night before the murder took place. She was able to recall the details of this particular night because she remembered hearing about the murder on the news the next day. She testified that Lisa's house was the "party house" where the gang generally hung out, drank large amounts of beer, and used drugs, especially marijuana. Parkhurst remembered appellant being at the house and among the gang members when they returned after midnight on the night of the murder.

Parkhurst testified that the gang members were celebrating and "energetic, happy like they really achieved something." She noticed that one member, "CJ," had little reddish brown spots on his arms, hands, and clothing. When she questioned him, CJ claimed the spots were paint which had been there before he left; however, Parkhurst testified that he had spots on him only on his return. Parkhurst also said that another member, Louie, also had spots on his hands and stains on his knees, and was wearing a black T-shirt which looked wet. Parkhurst further stated that Louie responded to her by saying "we fucked up a nigger" and "we kicked him as we bashed his fucking head in." She further testified that appellant actively participated in the celebration with the gang members while they sat drinking and loudly discussing the beating. At that time, Parkhurst said appellant never denied that this incident occurred.

Parkhurst also testified that a couple, John and Mary Urbina, were the gang's leaders. John, according to Parkhurst, supplied marijuana and beer for parties and presided over the initiation of new members. However, Parkhurst said neither John nor Mary was present at the party house on the evening of the murder. She also testified that the Bishops hated black people and would often attack them without provocation. Parkhurst also identified the wooden club given to Detective Anderson as being one of the clubs carried by gang members.

Another witness, John Urbina, admitted being the founder and leader of the Bishops. He also testified that the Bishops went out on a regular basis to "do jack moves" on black people. He confirmed that members sometimes carried clubs like the wooden club shown at trial. Urbina also testified that around August 4 or 5, 1992, appellant and two other gang members came to his house in the early morning hours. He testified that the three were arguing about a "jack move" on a "nigger" and "who hit him and who kicked him and who tore [his] clothing off—his pocket, who tore his pocket off, who was doing the most fists, who was doing this and that * * *." Urbina testified further that they also described how they kept beating the victim. According to Urbina, this incident had occurred within an hour before they arrived at his house. Urbina specifically testified that appellant described how he and another gang member had asked the victim for a cigarette, and then for the time. As the man reached to check his watch, the gang members hit him, beat him, ripped off his pocket, and took his wallet. However, on cross-examination, Urbina looked at a photo of the victim and noted that the man's pants pockets were intact.

Two additional witnesses, a forensic anthropologist and a Lucas County deputy coroner, presented evidence pertaining to the victim's injuries and cause of death. The anthropologist testified as to the injuries to the victim's skull. She reconstructed the skull, using the many pieces and fragments of bone which were found at the scene. She then testified that the type of instrument used to produce the injuries was fairly heavy, strong, and blunt.

The deputy coroner testified as to the specific types, locations, and likely causes of the victim's injuries. She testified that tremendous force would have been required to cause the fractures and extensive damage to the victim's skull. She stated that the injuries were similar to those sustained by a person hit by the high velocity impact found in train or auto accidents, as well as beatings. The deputy coroner also testified that, from linear patterns found on the skin, she determined that the injuries were consistent with being hit by the wooden club which had been entered into evidence. She further testified that blood spatters found on the wall of the storage building and garbage cans near the body were also consistent with the victim being hit by a club. The lack of large pools of blood under the body indicated that the victim died at the spot where the body was found, within just a few minutes after being hit. She confirmed that Huggins died as a result of craniocerebral injuries sustained from a beating.

After the state rested its case, appellant moved for a "directed verdict" which was overruled by the trial court. Appellant then presented his defense.

Appellant's first witness was his mother, Ezma Mae Misch. She testified that when she and appellant signed the waiver and consented to the initial questioning, they were unaware that appellant was considered a suspect in the murder

investigation. She also testified that appellant did not dislike black people, that he had black friends and that he had family members who were biracial.

Two other witnesses, a friend of the family and appellant's girlfriend, also testified. The family friend noted that appellant was very friendly to her husband, who is black. Appellant's girlfriend testified that, around the time of the murder, appellant was spending most of his time with her, as opposed to the gang. She also stated that appellant got along well with black people, that her aunt is biracial, and that she never heard appellant use the word "nigger."

Finally, appellant testified on his own behalf. He admitted that he became a member of the Bishops on July 2, 1992. However, shortly after that, he met his current girlfriend and consequently did not spend much time with the gang. He described the gang hierarchy and rules in detail, such as which members carried clubs and how initiation rites were carried out.

Appellant said that he recanted his original statement because it was not true. At trial, he denied being at Lisa's house or in the park that night. He further denied participating in any way in the murder. He admitted that, prior to making his statement, the detectives had read him his rights. However, he testified that he really had not understood them. Appellant further stated that he was coerced into making the statement because the detectives said that if he did not say he was there, they were "going to lock me up until [he] was fifty." He said that he made up the story using facts provided to him from the detectives' comments and questions. He also denied that his original description of the victim's hair in the taped statement accurately matched the victim's hair style.

The defense then rested. The jury returned verdicts of guilty on the aggravated murder charge, not guilty on the specification as a principal offender, and guilty on the aggravated robbery charge. At the sentencing hearing, appellant moved for judgment notwithstanding the verdict, which the trial court overruled. Appellant was sentenced to terms of twenty years to life as to the aggravated murder conviction, and ten to twenty-five years as to the aggravated robbery. The sentences are to be served concurrently.

Appellant appeals from the judgment of conviction and imposition of sentence, setting forth the following six assignments of error:

"1. The trial court committed plain error by instructing the jury that it could consider whether defendant-appellant was guilty of the lesser included offense of murder only upon agreeing that he was not guilty of the greater offense of aggravated murder and that it could consider the lesser included offense of involuntary manslaughter only upon agreeing that he was not guilty of the greater offense of murder.

"2. The evidence that defendant-appellant specifically intended to cause the death of Vernon E. Huggins was insufficient as a matter of law to support a verdict of aggravated murder.

"3. Because the evidence that defendant-appellant specifically intended to cause the death of Vernon E. Huggins was insufficient as a matter of law to support a verdict of aggravated murder, the trial court erred in overruling defendant-appellant's motions for judgment of acquittal and for judgment notwithstanding the verdict.

"4. The trial court erred in not granting defendant-appellant's motions for judgment of acquittal and for judgment notwithstanding the verdict when the jury returned verdicts on Count One which were logically inconsistent and, ultimately, impossible to reconcile.

"5. The trial court erred in accepting verdicts on Count One which were logically inconsistent and ultimately, impossible to reconcile.

"6. The trial court erred in failing to follow the dictates of C.P.Sup.R. 65."

I

Appellant, in his first assignment of error, argues that the trial court erred by instructing the jury that it could consider whether appellant was guilty of a lesser included offense only after deciding that appellant was not guilty of the greater offense.

Failure to object to an error in the trial court in a criminal proceeding precludes the issue from being raised on appeal, unless the issue rises to the level of plain error. See *State v. Underwood* (1983), 3 Ohio St.3d 12, 13, 3 OBR 360, 361, 444 N.E.2d 1332, 1333; *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804. Plain error is an obvious error or defect in the trial court proceedings, affecting substantial rights, where, "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Underwood, supra*, at syllabus; *State v. Long, supra*, at paragraph two of the syllabus; see, also, Crim.R. 52(B).

In the present case, appellant's counsel failed to object to the trial court's phrasing of the jury instructions. Therefore, appellant is precluded from raising this issue on appeal except under the doctrine of plain error.

In *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph three of the syllabus, the Supreme Court of Ohio held that a jury is not required to unanimously agree that a defendant is not guilty of a greater offense before considering a lesser included offense. The *Thomas* court determined that the jury instructions in that case were not unduly prejudicial since the instructions

**648**

were merely ambiguous as to how the jury was to consider the offenses, rather than coercive. *Id.* at 220, 533 N.E.2d at 292–293.

■ In the present case, among the jury instructions given, the trial court stated:

"It is your duty to first *attempt* to reach a unanimous verdict of guilty or not guilty on count one, aggravated murder, uninfluenced by your power to find the lesser included—a lesser offense." (Emphasis added.)

Therefore, under the *Thomas* standard, the jury instruction is improperly vague. However, even though the trial court failed to use the preferred "inability to agree" language of *Thomas,* the instructions were not unduly prejudicial to appellant's case. Based on a thorough review of the record, we cannot say that "but for" this jury instruction, the results of the trial would have been otherwise. Therefore, any error committed by the trial court does not rise to the level of plain error. 

Accordingly, appellant's first assignment of error is not well taken.

## II

Appellant, in his second assignment of error, contends that the evidence that appellant specifically intended to cause the death of Vernon E. Huggins was insufficient to support a verdict of aggravated murder as a matter of law.

Upon review of the sufficiency of the evidence to support a criminal conviction, an appellate court must examine "the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

■ "Relevant inquiry" does not include interpretation of evidence or determination of credibility of witnesses by the appellate court. *Id.* at 273, 574 N.E.2d at 503. The verdict will not be overturned unless reasonable minds could not reach the conclusion reached by the trier of fact. *Id.*

R.C. 2903.01(B), aggravated murder, includes the following elements:

"No person shall purposely cause the death of another while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson or arson, aggravated robbery or robbery, aggravated burglary or burglary, or escape."

"Purposely" is defined in R.C. 2901.22(A), as follows:

"A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."

A person is "presumed to intend the natural, reasonable and probable consequences of his voluntary acts." *State v. Carter* (1992), 64 Ohio St.3d 218, 226, 594 N.E.2d 595, 601, quoting *State v. Johnson* (1978), 56 Ohio St.2d 35, 39, 10 O.O.3d 78, 80, 381 N.E.2d 637, 640. A homicide is a natural and probable consequence resulting from the commission of a felony where the participants enter into a common plan to commit the felony and are aware that an inherently dangerous instrumentality is to be used in the commission of the felony. *State v. Clark* (1978), 55 Ohio St.2d 257, 9 O.O.3d 257, 379 N.E.2d 597, syllabus. Such consequence "must be presumed to have been intended and such evidence is sufficient to find a purposeful intent to kill." *Id.*

In the present case, testimony was presented which placed appellant at the scene of the murder of Vernon Huggins. The jury also heard testimony that appellant was a member of a gang known as the Bishops, that some members of the gang carried clubs which were used to beat people during robberies or other gang activities, that the gang members hated black people and regularly found opportunities to attack them, and that appellant played an integral part in the beating which resulted in the death of Huggins. Appellant admitted, during his taped statement, to voluntarily stopping a black man as he crossed the park so that other gang members could carry out the planned attack. Testimony from other witnesses linked appellant to Huggins's murder by date and time of day.

The evidence presented, if believed by the jury, established that appellant voluntarily participated in a common plan in which a club was used to beat a black man; as a natural and probable consequence of the beating, the victim died. Therefore, we conclude that the evidence presented was sufficient to allow reasonable minds to find that appellant acted purposefully in causing the death of Huggins. Accordingly, appellant's second assignment of error is not well taken.

III

Appellant, in his third assignment of error, argues that the trial court erred when it denied his motions for judgment of acquittal (referred to as a "directed verdict" during the trial) and for "judgment notwithstanding the verdict."

Initially, we note that the Criminal Rules do not provide for motions for "directed verdict" or "judgment notwithstanding the verdict." See *Cleveland Hts. v. Richardson* (1983), 9 Ohio App.3d 152, 153, 9 OBR 218, 219, 458 N.E.2d

901, 902.  However, we will construe appellant's motion for directed verdict made at the close of the state's case to be a motion for acquittal.  See Crim.R. 29(A). We will also construe appellant's motion for judgment notwithstanding the verdict to be a judgment for acquittal made after the verdict.  See Crim.R. 29(C).

A trial court shall not grant a motion for acquittal pursuant to Crim.R. 29(A) "if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184, syllabus.  The same standard applies to postjudgment motions for acquittal made pursuant to Crim.R. 29(C).  *State v. Beehive Ltd. Partnership* (1993), 89 Ohio App.3d 718, 723, 627 N.E.2d 592, 596.

As we noted in appellant's second assignment of error, the evidence presented was sufficient, if believed by the jury, to establish all the essential elements of the offense of aggravated murder.  Therefore, since it follows that reasonable minds could have reached different conclusions as to whether the elements were proved, we conclude that the trial court did not err in overruling appellant's motion for judgment of acquittal ("directed verdict") and postjudgment motion for acquittal ("JNOV").

Accordingly, appellant's third assignment of error is not well taken.

## IV

Appellant, in his fourth and fifth assignments of error, argues that the trial court erred in denying his motions for acquittal and "judgment notwithstanding the verdict" because the verdicts as listed in Count One were inconsistent.

" 'Where a jury convicts a defendant of an aggravated murder committed in the course of an aggravated robbery, and where that defendant is concurrently acquitted of a specification indicting him for identical behavior, the general verdict is not invalid.' " *State v. Evans* (1992), 63 Ohio St.3d 231, 241–242, 586 N.E.2d 1042, 1052.  The *Evans* court noted that it is consistent for a jury to find a defendant "guilty of the underlying aggravated murder as an accomplice, but not find that he was a principal offender." *Id.* at 242, 586 N.E.2d at 1053.

■ In the instant case, the jury was instructed as to what each count of the indictment meant, including the specification as a principal offender.  As in *Evans*, we conclude that the evidence supported a finding by the jury that appellant was guilty as an accomplice in the underlying charge of aggravated murder, but not guilty as a principal offender.  Therefore, the jury verdicts were not inconsistent and the trial court did not err in accepting such verdicts. Accordingly, appellant's fourth and fifth assignments of error are not well taken.

V

Appellant, in his sixth assignment of error, argues that the trial court erred because it failed to appoint two specially certified attorneys as required by C.P.Sup.R. 65. Appellant essentially argues that C.P.Sup.R. 65 applies to juvenile defendants and noncompliance with the rule creates a conclusive presumption of prejudicial error.

C.P.Sup.R. 65 requires that when charged with a capital offense, an indigent defendant is entitled to two attorneys who have been certified as experienced in capital cases. This rule was adopted " 'in recognition of and in response to the risks of having inexperienced, ill-prepared counsel appointed to represent persons charged with capital crimes, thereby risking that an innocent person may be convicted or that one convicted of a capital crime may be inappropriately sentenced to death.' C.P.Sup.R. 65(I) (Committee Comments)." *State v. Harris* (Dec. 21, 1994), Montgomery App. No. 14343, unreported, 1994 WL 718227.

However, lack of certification under C.P.Sup.R. 65 does not automatically create a presumption that counsel has not provided effective assistance of counsel. *Id.* The effectiveness of counsel not qualified under this rule must be judged under the standard set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674, 697–698, *i.e.*, whether counsel's performance was unreasonably deficient and, if so, whether but for that deficiency, the result of the proceedings would have been different.

In the present case, appellant's argument centers mainly on whether the rule applies to juveniles. However, even assuming for the sake of argument only, as juvenile offenders are not subject to capital punishment in Ohio, that juveniles are protected under the rule, we agree with the *Harris* rationale. The failure to follow C.P.Sup.R. 65 does not automatically create reversible error. Appellant fails to assert any claim that trial counsel's performance was deficient and, therefore, fails to establish that any prejudice occurred which denied him a fair trial. Therefore, we conclude that the trial court did not commit prejudicial error in failing to follow C.P.Sup.R. 65.

Accordingly, appellant's sixth assignment of error is not well taken.

The judgment of the Lucas County Court of Common Pleas is affirmed. Court costs of this appeal are assessed to appellant.

*Judgment affirmed.*

HANDWORK and M.L. RESNICK, JJ., concur.