[Cite as *State v. Misch*, 2021-Ohio-756.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                     Court of Appeals No. L-20-1094

    Appellee                              Trial Court No. CR0199306298

v.

Eric Misch                                        **DECISION AND JUDGMENT**

    Appellant                             Decided:  March 12, 2021

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Timothy Young, Ohio Public Defender, Joanna Sanchez and
Katherine Sato, Assistant Public Defenders, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} This case is before the court on appeal by appellant, Eric Misch, from the

April 28, 2020 judgment of the Lucas County Court of Common Pleas, denying

appellant's motion for leave to be excused from duty to enroll in the violent offender

database.  For the reasons that follow, we affirm the judgment of the trial court.

**{¶ 2}** Appellant sets forth the following two assignments of error:

I. Ohio's violent offender registry is punitive and not remedial. As a result, the trial court erred by retroactively applying the statute to Mr. Misch. April 28, 2020 Judgment Entry on Defendant's Motion for Leave to be Excused from Duty to Enroll in the Violent Offender Database; Ohio Constitution, Article II, Section 28.

II. The trial court erred when it denied Mr. Misch's motion to be excused from enrolling in the violent offender database. April 28, 2020 Judgment Entry on Defendant's Motion for Leave to be Excused from Duty to Enroll in the Violent Offender Database; R.C. 2903.41, et. seq.

### Procedural History

**{¶ 3}** On July 2, 1993, appellant was indicted on charges of aggravated murder in violation of R.C. 2903.01(B), with an aggravating circumstance in violation of R.C. 2929.04(A)(7) and 2941.14, as well as a charge of aggravated robbery in violation of R.C. 2911.01(A)(2). He was convicted after a jury trial of both charges, but he was acquitted of the specification. He was sentenced to 20 years to life for the aggravated murder conviction, to be served concurrently with 10-25 years for the aggravated robbery conviction. This court affirmed the convictions in *State v. Misch*, 101 Ohio App.3d 640, 656 N.E.2d 381 (6th Dist.1995).

**{¶ 4}** Appellant, who was released from prison on April 23, 2020, moved the court: (1) for postconviction DNA testing; (2) for leave to file a delayed motion for a

2.

new trial; and (3) to be excused from his duties to report as a violent offender. The motion for leave to file a delayed motion for a new trial remains decisional. The trial court granted the petition for postconviction DNA testing and denied the motion to be excused from reporting as a violent offender.

{¶ 5} Appellant now seeks review of the denial of his motion to be excused from reporting.

**Facts**

{¶ 6} On August 4, 1992, the body of Vernon Huggins, an African American man, was discovered in Wilson Park, in Toledo. A crime stopper call caused police to interview appellant, who was then 16 years old. Although he initially denied any knowledge of the murder, detectives told him that two members of his gang had linked him to the murder, and he admitted his involvement in the crime. Officers drove him to the park where the body was discovered, with appellant directing them as to the route the gang took the night of the murder and pointing out areas relevant to the attack on Huggins.

{¶ 7} Officers then took appellant back to the station, where he gave a recorded statement admitting that he had been with several members of the Bishops gang on the night of the murder. He stated that the group had been to a party at the house of someone named Lisa, but that they left and, after meeting up with two more gang members, walked to Woodward High School and then on to Wilson Park. Once there, they saw a young African American male who appellant described as having hair that "faded up"

3.

and had "poofy curls on top." One of the gang members said, "Let's jack this dude," meaning that they would rob the man. Appellant said his role was to approach the man and ask for a cigarette or for the time, with the purpose of distracting him and slowing him down. When appellant did so, the other gang members attacked the man, kicking and beating him for about two minutes. The gang then returned to Lisa's house at about 1:30 a.m. At the house, a girl named Michelle asked one of the gang members what they had done, because two of the gang members had blood stains and spatters on their pants.

{¶ 8} At trial, investigating officers testified that the victim's body was found in grass near a storage building and a group of trash barrels. One officer described the victim's hair as being built up and higher on the top.

{¶ 9} Another witness, Michelle Parkhurst, testified that she was a member of the Bishops and had been present at another party at Lisa's house—the so-called "party house"—on the night before the murder. She remembered that, on the night of the murder, appellant was at the house and, further, was among the gang members when they returned to the house after midnight. She said that the gang members were celebrating and "energetic, happy like they really achieved something." One member, "C.J.," had reddish brown spots on his arms, hands, and clothing that had not been there when he left the house. Another member, Louie, had spots on his hands and stains on his knees and a black t-shirt that looked wet. Louie said "we fucked up a n*****," and "we kicked him as we bashed his fucking head in." Appellant actively participated in the celebration while they discussed the beating, and he never denied that the incident occurred.

{¶ 10} John Urbina founded and led the Bishops. He testified that the Bishops regularly went out to "do jack moves" on black people. He also testified that appellant and two other gang members came to his house in the early morning hours, talking about a "jack move" on a n*****," and about "who hit him and who kicked him and who * * * tore his pocket off, who was doing the most fists, who was doing this and that * * *." Urbina said that they talked about how they kept beating the victim, and appellant described how he and another gang member had asked the victim for a cigarette and for the time, and that as he reached to check his watch, the gang hit him, beat him, ripped off his pocket and took his wallet.

{¶ 11} Witness Rosemary Knell provided police detectives with a wooden club that had belonged to Joseph Rickard, who was another member of the Bishops gang. She received the club sometime between June and October of 1992, and she kept it until turning it over to police on February 3, 1993. Michelle Parkhurst and John Urbina identified the club as a weapon that looked like those carried by members of the Bishops.

{¶ 12} A deputy coroner testified that the victim's injuries were caused by a tremendous force, and that they were similar to injuries sustained by a person hit by the type of high velocity impact that is found in train or auto accidents, as well as in beatings. She further testified that the victim's injuries were consistent with being hit by the wooden club that had been entered into evidence, and that blood spatters that were found on the wall of the storage building and on the garbage cans located near the body were consistent with the victim being hit by a club. Finally, a forensic anthropologist testified

5.

that the club that was given to police by Knell was consistent with the injuries inflicted on the victim's skull.  The deputy coroner confirmed that the victim died minutes after being hit, as the result of craniocerebral injuries that were sustained in the beating.

{¶ 13} In appellant's defense, several witnesses, including appellant's girlfriend, testified that appellant did not dislike African American people.  His girlfriend further testified that at the time of the murder, appellant was spending most of his time with her, that her aunt is biracial, and that she never heard him use the word "n*****."  Appellant himself stated that he became a member of the Bishops the month before the murder, but shortly after that met his girlfriend and did not spend much time with the gang.  He denied being at Lisa's house or in the park on the night of the murder, and he denied any involvement in the murder.  He said that he recanted his original statement because it was not true, and that detectives had told him that if he did not say he was there, they were going to lock him up until he was 50.

## Analysis

{¶ 14} Appellant asserts in his first assignment of error that application of the R.C. 2943.01 violent offender registry (VOD) to appellant, based upon his more than 26-year-old conviction, was in violation of the Ohio Constitution's prohibition against retroactivity.  This court, in *State v. Lamb*, 6th Dist. Lucas No. L-19-1177, 2021-Ohio-87, recently addressed the propriety of retroactively applying Ohio's VOD statute, and, reasoning as follows, ultimately concluded that the VOD statute is remedial in nature and, therefore, is constitutional:

6.

Currently pending before the Ohio Supreme Court is a certified conflict between the Courts of Appeals for the Twelfth and Fifth Districts on the issue whether the VOD statutes, when applied to an offense that occurred before the statutes' March 20, 2019 effective date, violate the prohibition against retroactive statutes contained in Article II, Section 28, of the Ohio Constitution. *See State v. Hubbard*, 159 Ohio St.3d 1427, 2020-Ohio-3473, 148 N.E.3d 568 (Table); *State v. Jarvis*, 159 Ohio St.3d 1427, 2020-Ohio-3473, 148 N.E.3d 568 (Table). *See also State v. Rike*, 1st Dist. Hamilton No. C-190401, 2020-Ohio-4690 (finding no retroactivity-clause violation); *State v. Jackson*, 10th Dist. Franklin No. 19AP-393, 2020-Ohio-4115 (declining to decide retroactivity-clause challenge upon determining that the case was not ripe for decision); *State v. Morgan*, 2020-Ohio-3955, 156 N.E.3d 989 (9th Dist.) (finding no retroactivity-clause violation). *State v. Klein*, 1st Dist. No. C-190619, 2020-Ohio-6948, ¶ 16.

Until the Supreme Court resolves this conflict, we are inclined to follow the position of a majority of our fellow appellate districts and find that the VOD statute before us as applied is remedial in nature and therefore find it to be constitutional, utilizing the same logic employed by the court in *Hubbard:*

"Given the many differences between the sex-offender registration statutes and the violent-offender enrollment statutes, we find that the

violent-offender enrollment requirements are not so punitive that they impose a new burden in the constitutional sense, as contemplated in *Williams*. Rather, we find that the violent-offender enrollment requirements are more akin to the arson-offender registration requirements set forth in R.C. 2909.13, 2909.14, and 2909.15, which the First District found were remedial in nature. *See Caldwell*, 2014-Ohio-3566, 18 N.E.3d 467 at ¶ 33-35. Accordingly, as appellant had no expectation of finality with regard to any duties that may or may not have attached following his conviction for murder, he does not have a substantive right in this regard. See *id.* at ¶ 35*; Cook*, 83 Ohio St.3d at 414, 700 N.E.2d 570. The violent-offender enrollment statutes are remedial in nature, and the General Assembly could retroactively impose Sierah's Law without running afoul of Article II, Section 28 of the Ohio Constitution. *State v. Hubbard*, 2020-Ohio-856, ¶ 37, 146 N.E.3d 593, 604, motion to certify allowed, 2020-Ohio-3473, ¶ 37, 159 Ohio St. 3d 1427, 148 N.E.3d 568, and appeal allowed, 2020-Ohio-3473, ¶ 37, 159 Ohio St. 3d 1427, 148 N.E.3d 569. *Hubbard*, at Paragraph 37."

*Id.* at ¶ 57-58. Employing the identical logic that was used in both *Lamb* and in *Hubbard*, we find that the VOD statute, as applied to appellant in this case, is remedial in nature and, therefore, is constitutional. Accordingly, we find appellant's first assignment of error not well-taken.

8.

{¶ 15} Appellant argues in his second assignment of error that the trial court erred in denying his motion to be excused from enrolling in Ohio's violent offender database solely on the basis that appellant was convicted of the charge of aggravated murder.

{¶ 16} When the Ohio General Assembly enacted Sierah's Law, it created a presumptive duty of enrollment for offenders convicted of specific violent offenses including, as applicable here, aggravated murder. R.C. 2903.41(A)(1)(a)-(b). The presumptive duty to enroll, however, can be overcome if the sentencing court finds, upon a defendant's motion, that he was not the principal offender. R.C. 2903.42(A)(4)(a). If the presumption is overcome, the court shall determine whether, notwithstanding the rebuttal of the presumption, the defendant must nonetheless enroll. *Id.* To guide its analysis, the court must weigh the following factors:

(i) Whether the offender has any convictions for any offense of violence, prior to the offense at issue that classifies the person a violent offender, and whether those prior convictions, if any, indicate that the offender has a propensity for violence;

(ii) The results of a risk assessment of the offender conducted through use of the single validated risk assessment tool established under section 5120.114 of the Revised Code;

(iii) The degree of culpability or involvement of the offender in the offense at issue that classifies the person a violent offender;

(iv) The public interest and safety.

*Id.* Appellant asserts that although the trial court correctly identified the framework established by the General Assembly, it ultimately ignored that framework.

{¶ 17} We note at the outset of our analysis that neither the statute itself nor Ohio appellate courts have identified the standard of review applicable to a denial of a motion to be excused from enrolling in the violent offender database. Given the absence of authority in this area, we conclude that the court should review the matter for abuse of discretion, consistent with the review that has been afforded in appeals from denials of other remedies intended to alleviate the collateral consequences of a criminal conviction. *See, e.g., In re Buzzell*, 6th Dist. Lucas No. L-20-1012, 2020-Ohio-4242, ¶ 11 (petition for certificate of employment qualification pursuant to R.C. 2953.25); *In re Chrosniak*, 2017-Ohio-7408, 96 N.E.3d 1083, ¶ 14 (8th Dist.) (application for relief from disability pursuant to R.C. 2923.14); and *State v. Haas*, 6th Dist. Lucas No. L-04-1315, 2005-Ohio-4350, ¶ 19 (expungement pursuant to R.C. 2953.32).

{¶ 18} The abuse of discretion standard recognizes the court's "inherent authority and wide discretion in exercising its duty to administer proceedings." *State v. Cunningham*, 113 Ohio St.3d 108, 2007-Ohio-1245, 863 N.E.2d 120, ¶ 25 (citations omitted). A discretionary decision "will not be disturbed absent a showing that the court abused that discretion," which requires a showing of "an unreasonable, arbitrary, or unconscionable use of discretion," or which involves a course of action "that no conscientious judge, acting intelligently, could honestly have taken." *Id.* (citations omitted); and *State ex rel. Wilms v. Blake*, 144 Ohio St. 619, 624, 60 N.E.2d 308 (1945).

10.

{¶ 19} With this standard of review in mind, we consider the lower court's analysis and application of the Ohio violent offender registry law. First, the trial court properly determined, by a preponderance of the evidence, that appellant was not a principal offender. That is, there was no evidence to suggest that appellant physically participated in Huggins' beating. Instead, the evidence revealed that appellant's role was to set up the victim for the beating that was subsequently inflicted by the principal offenders. Because appellant was not a principal offender, the trial court properly concluded that the presumption that appellant must enroll in the violent offender database was rebutted. *See* R.C. 2903.42(A)(4)(a).

{¶ 20} Next, the court considered the factors set forth at R.C 2903.42(A)(4)(a)(i)-(iv). The court concluded that the first two factors "merit[ed] against * * * compelling [appellant] to register in the VOD." First, the evidence was undisputed that appellant had no prior convictions. *See* R.C. 2903.42(A)(4)(a)(i). And second, appellant's most recent risk score on the Ohio Risk Assessment System Reentry Tool (ORAS-RT) was 9, which falls in the low risk category. *See* R.C. 2903.42(A)(4)(a)(ii).

{¶ 21} Regarding the third factor, appellant's culpability in the offense, the trial court observed that although appellant "did not physically take part in the beating which ultimately caused the death of Mr. Huggins," "he nevertheless set up the opportunity for his cohorts to attack Mr. Huggins, and his culpability for such actions is certainly reflected in his convictions for aggravated murder and aggravated robbery." The court went on to state that "[w]hile [appellant] may contend that he was 'minimally involved,'

11.

in Mr. Huggins' murder, the fact remains that a jury found his culpability equaled that which was required for a conviction of aggravated murder[;] [s]uch considerations are weighed heavily by the court." *See* R.C. 2903.42(A)(4)(a)(iii).

{¶ 22} Lastly, the court, upon considering the fourth factor involving the public interest and safety, specifically recognized that appellant had "furthered his education while incarcerated by obtaining a high school diploma equivalent and an associate degree in business administration from the University of Findlay." In addition, the court stated that appellant appeared "to have significant vocational training and work experience such that he appears to be employable upon his release." Finally, the court took notice of a statement by appellant that "much of [appellant's] family (including siblings, his father, and his stepmother) continue[d] to reside in Toledo and * * * remained in regular contact with him." *See* R.C. 2903.42(A)(4)(a)(iv).

{¶ 23} The court ended its analysis with the following observations and conclusions:

> [A]s stated previously, the jury did find, based upon all of the evidence and arguments, that [appellant] was guilty of aggravated murder. Ultimately, he was found to be sufficiently culpable for committing the highest offense in our criminal justice system, and this fact is inescapable for the Court. The purpose and intent of the General Assembly in passing R.C. 2903.41-2903.44 was for the protection of the community and law enforcement who come in contact with individuals convicted of violent offenses. Therefore,

12.

despite some factors meriting in Defendant's favor, the Court still finds his registration in the VOD to be necessary. Defendant's motion is therefore not well-taken and denied.

{¶ 24} Review of the foregoing reveals that the trial court scrupulously considered and adhered to the language of the statute in this case. The court properly reasoned that Sierah's Law "was for protection of the community and law enforcement who come in contact with individuals convicted of violent offenses." Although the court recognized that certain factors weighed in favor of excusing the duty to register, the court obviously viewed those factors as outweighed by the concern for public safety. The trial court's conclusion that the interest of public safety warranted a registry period does not render the court's decision an abuse of discretion, nor does it suggest that the court "recognized, then ultimately ignored" the statutory requirements.

{¶ 25} In *Cunningham*, *supra*, the Supreme Court of Ohio observed that the trial court did not abuse its discretion when it "did not act arbitrarily or otherwise ignore the language of the statute." *Cunningham*, 113 Ohio St.3d 108, 2007-Ohio-1245, 863 N.E.2d 120, at ¶ 26. We find that the same is true of the trial court in this case.

{¶ 26} Arguing against this conclusion, appellant asserts that the trial court based its decision entirely on the fact that appellant was convicted of aggravated murder, and, in so doing, "created a rule that is both inconsistent with the General Assembly's clear intent" and, further, "deprives the court of its discretion," to the extent that it requires that "any person convicted of aggravated murder must enroll in the violent offender

13.

database." We disagree with appellant's interpretation of the trial court's analysis. The trial court, in rendering its decision, did not simply rely on the fact of appellant's conviction for aggravated murder. Instead, the court recognized that the conviction—not just for aggravated murder, but also for aggravated robbery—came not just from a plea, for example, but from a full trial, where evidence and arguments were presented for both sides. In addition, a review of the facts in this case, as gleaned from the evidence, makes clear that the crime for which appellant was convicted was extremely brutal and, further, quite possibly was racially motivated.

{¶ 27} For all of the foregoing reasons, appellant's second assignment of error is found not well-taken and is denied. Accordingly, the judgment of the Lucas County Court of Common Pleas is hereby affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.                        _____
                                                                     JUDGE

Thomas J. Osowik, J.

                                                                  _____
Myron C. Duhart, J.                          JUDGE
CONCUR.

                                                                   _____
                                                                      JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.