OPINION
{¶ 1} Defendant-appellant, Sidney Cornwell, appeals a decision of the Mahoning County Common Pleas Court denying his petition for postconviction relief and request for an evidentiary hearing.
 {¶ 2} The recitation of the facts contained in this opinion are adopted verbatim from those recited by Justice Pfeifer in State v.Cornwell (1999), 86 Ohio St.3d 560. During the early morning hours of June 11, 1996, defendant-appellant, Sidney Cornwell, and some associates who belonged to a neighborhood gang in Youngstown drove up to an apartment building on Oak Park Lane with the intention of shooting a rival gang member. When the intended victim was not seen, Cornwell opened fire on the occupants of an apartment, killing a three-year-old child and wounding three adults. Cornwell was subsequently convicted of aggravated murder and attempted aggravated murder, and sentenced to death.
 {¶ 3} On the afternoon of the previous day, Cornwell and other members or associates of the "Crips" gang had been involved in a shootout with members of the "Bloods" gang on Elm Street at New York Avenue in Youngstown. One of the associates of the Crips, Edward McGaha, was grazed on the head by a bullet during the gunfire exchange. McGaha saw Richard "Boom" Miles, a member of the Bloods, and Michael Williams leave the scene, but did not see either of them shooting. During the shootout, McGaha saw Cornwell using a black gun. Police later recovered six 9-mm Luger shell casings from the shooting scene at the corner of New York Avenue and Elm Street.
 {¶ 4} Later that afternoon, McGaha was released from the hospital and went to his mother's home on Elm Street. While he was standing outside in front of the house with several people, including Cornwell, a carload of Bloods jumped out and opened fire on them. According to McGaha, Cornwell returned gunfire with the same black semiautomatic weapon he had used at the earlier shootout.
 {¶ 5} Shortly thereafter, McGaha, Cornwell, and others gathered at a New York Avenue house where a man named "Heavy" lived. Also present at Heavy's house were Gary Drayton, Leslie Johnson, Edward Bunkley, and Denicholas Stoutmire. The talk among the group centered on retaliation for the earlier shooting of McGaha. The plan of action was to kill Boom Miles. Although McGaha later admitted on cross-examination that he knew that Boom was not the person who had shot him, he went along with the plan to seek out and kill Boom.
 {¶ 6} That night, Bunkley and Stoutmire stole two vehicles, a Buick and a Pontiac Bonneville, in order to facilitate the group's search for Boom. During this time, the rest of the group remained at Heavy's place, drinking and smoking marijuana. When Bunkley and Stoutmire returned to Heavy's with the stolen cars, the group (minus Heavy) went out to search for Boom around Youngstown. By this time Antwan Jones and Damian Williams had joined the group. The group used a third car, a Chevette belonging to a friend.
 {¶ 7} Stoutmire drove the stolen blue Bonneville while Williams rode with him in the front passenger seat. Johnson sat in the back seat behind Williams, and Cornwell sat in the driver side back seat behind Stoutmire. According to one witness, the only people carrying weapons in the Bonneville were Williams, who had a .45 automatic pistol, and Cornwell, who had a semiautomatic 9-mm black gun. However, Bunkley testified that the other two passengers in the Bonneville also had weapons. Nevertheless, Bunkley did corroborate several witnesses' testimony that Cornwell was carrying a 9-mm weapon.
 {¶ 8} After driving around Youngstown for about an hour, the three cars proceeded to Oak Park Lane because Stoutmire thought Boom might be there. Susan Hamlett lived in Apartment No. 5 in the apartment building at 4 Oak Park Lane in Youngstown. Hamlett's friend, Marilyn Conrad, and Conrad's son also lived with Hamlett, along with Hamlett's nephew and two nieces, one of whom was three-year-old Jessica Ballew. Hamlett was familiar with Boom and knew that he frequented the Oak Park area. Earlier that evening, Boom had played with the children who lived in Hamlett's apartment, but Hamlett did not see him after that.
 {¶ 9} At approximately 2:00 a.m. on June 11, 1996, Hamlett was outside on her porch talking to a friend, Donald Meadows. Jessica Ballew came to the doorway on the porch to get a drink of water. At that time, three cars drove up Oak Park Lane. The first two cars went past the apartment, but the light blue Bonneville stopped in front of the apartment, and a voice came from the car asking for Boom. According to Damian Williams, who was seated in the Bonneville with Cornwell, the voice from the car was Cornwell's. Both Hamlett and Meadows responded that Boom was not there. Cornwell asked again where Boom was, and Hamlett said that he did not live there. Cornwell then replied: "Well, tell Boom this." A volley of shots (more than five, less than ten) was fired at the apartment. Jessica Ballew sustained two gunshot wounds, including a fatal one to her head. Meadows was wounded, as were Conrad and a visiting friend who was inside. The three vehicles fled the scene, and Damian Williams was dropped off because he "didn't want anything to do with a baby getting killed."
 {¶ 10} Youngstown police officer Joseph Wess soon received a call regarding the shooting at Oak Park Lane. He then noticed three cars, two of them fitting the descriptions he had just received. He pursued the vehicles and saw the Bonneville parked in the driveway of a vacant house. With his car lights off, Wess pulled up behind the Bonneville. Then Wess turned on his headlights, and all of the occupants jumped out of the Bonneville and ran away. Wess pursued one suspect, who he said jumped out of the driver's door, catching him after a brief foot chase. That suspect turned out to be Sidney Cornwell, who was immediately arrested. Upon conducting a search of the Bonneville, Wess found, among other items, a spent 9-mm shell casing. However, no gun was found in the Bonneville.
 {¶ 11} On July 26, 1996, a Grand Jury indicted Cornwell for aggravated murder (prior calculation and design) and three counts of attempted aggravated murder. Each count also carried a firearm specification. In addition, a death-penalty specification alleged that Cornwell had committed aggravated murder as part of a course of conduct involving the purposeful killing of, or attempt to kill, two or more persons (R.C. 2929.04[A][5]).
 {¶ 12} At trial before a jury, Donald Meadows, one of the victims of the Oak Park Lane shooting, identified Cornwell as the man who had shot him. Damian Williams, one of Cornwell's accomplices in the blue Bonneville on the morning of June 11, also identified Cornwell as the sole gunman in the fatal shooting at Oak Park Lane.
 {¶ 13} Officer Robert Mauldin testified that he and other officers recovered several 9-mm shell casings from the area of Elm Street and New York Avenue on June 10, 1996, and from the area of Oak Park Lane, Apartment No. 5, on the early morning of June 11. Although Mauldin stated that .380 shell casings were also found at the scene of the Elm Street and New York Avenue shooting, only 9-mm shell casings were recovered from the Oak Park area. Mauldin also identified two 9-mm shell casings that were recovered from the Bonneville that was at the Oak Park shooting.
 {¶ 14} Michael Roberts, a forensic scientist with the Ohio Bureau of Criminal Identification and Investigation, testified that, to a reasonable degree of scientific certainty, all ten 9-mm Luger shell casings recovered from both the Elm Street and Oak Park Lane shootings came from the same handgun. The murder weapon was never recovered. After deliberation, the jury found Cornwell guilty as charged.
 {¶ 15} At the mitigation hearing, nine witnesses testified on Cornwell's behalf, including his mother, three siblings, and other relatives. Psychologist James Eisenberg concluded that Cornwell had grown up in a violent and chaotic family, which caused him serious problems of identity and dependency.
 {¶ 16} The jury recommended death, and the trial court imposed the death sentence on Cornwell. The court then sentenced Cornwell to prison on his other convictions.
 {¶ 17} On a direct appeal to the Ohio Supreme Court, appellant's conviction and sentence were unanimously affirmed. State v. Cornwell
(1999), 86 Ohio St.3d 560.
 {¶ 18} On May 21, 1999, appellant filed a petition for postconviction relief in the trial court. The trial court permitted appellant to conduct discovery and he subsequently filed numerous amendments to the petition setting forth additional claims and exhibits. Appellee filed a motion for summary judgment. After a hearing on the matter, the trial court granted appellee's motion on October 6, 2000. The court denied each of appellant's forty-nine claims for relief. This appeal followed.
 {¶ 19} R.C. 2953.21, which governs petitions for postconviction relief, provides:
 {¶ 20} "(A)(1) Any person who has been convicted of a criminal offense or adjudicated a delinquent child and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. The petitioner may file a supporting affidavit and other documentary evidence in support of the claim for relief.
 {¶ 21} "* * *
 {¶ 22} "(C) * * * Before granting a hearing on a petition filed under division (A) of this section, the court shall determine whether there are substantive grounds for relief. In making such a determination, the court shall consider, in addition to the petition, the supporting affidavits, and the documentary evidence, all the files and records pertaining to the proceedings against the petitioner, including, but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court, and the court reporter's transcript. The court reporter's transcript, if ordered and certified by the court, shall be taxed as court costs. If the court dismisses the petition, it shall make and file findings of fact and conclusions of law with respect to such dismissal.
 {¶ 23} "(D) Within ten days after the docketing of the petition, or within any further time that the court may fix for good cause shown, the prosecuting attorney shall respond by answer or motion. Within twenty days from the date the issues are made up, either party may move for summary judgment. The right to summary judgment shall appear on the face of the record.
 {¶ 24} "(E) Unless the petition and the files and records of the case show the petitioner is not entitled to relief, the court shall proceed to a prompt hearing on the issues even if a direct appeal of the case is pending. * * *"
 {¶ 25} A criminal defendant seeking to challenge his conviction through a petition for postconviction relief is not automatically entitled to a hearing. State v. Cole (1982), 2 Ohio St.3d 112, 113. "Before granting an evidentiary hearing on the petition, the trial court shall determine whether there are substantive grounds for relief (R.C.2953.21[C]), i.e., whether there are grounds to believe that `there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States.'" (Emphasis added.) R.C. 2953.21(A)(1)." Statev. Calhoun (1999), 86 Ohio St.3d 279, 282-83. Therefore, before a hearing is granted, the petitioner bears the initial burden of submitting evidentiary documents containing sufficient operative facts that demonstrate the merit of his claims. See id.
 {¶ 26} Evidence attached to a petition for postconviction relief must meet "some threshold standard of cogency." State v. Lawson (1995),103 Ohio App.3d 307, 315. That threshold is not met by evidence which is "only marginally significant and does not advance the petitioner's claim beyond mere hypothesis and a desire for further discovery." Id. Additionally, "where a petitioner relies upon affidavit testimony as the basis of entitlement to postconviction relief, and the information in the affidavit, even if true, does not rise to the level of demonstrating a constitutional violation, then the actual truth or falsity of the affidavit is inconsequential." State v. Calhoun (1999), 86 Ohio St.3d 279,284.
 {¶ 27} Even when affidavits are filed in support of the petition, although a trial court "should give [them] due deference," it may also "judge their credibility in determining whether to accept the affidavits as true statements of fact." Id. at 284. In assessing the credibility of affidavit testimony, the consideration should be given to "all relevant factors." Id. Among those factors are (1) whether the judge reviewing the postconviction relief petition also presided at the trial, (2) whether multiple affidavits contain nearly identical language, or otherwise appear to have been drafted by the same person, (3) whether the affidavits contain or rely on hearsay, (4) whether the affiants are relatives of the petitioner, or otherwise interested in the success of the petitioner's efforts, and (5) whether the affidavits contradict evidence proffered by the defense at trial. Moreover, a trial court may find sworn testimony in an affidavit to be contradicted by evidence in the record by the same witnesses, or to be internally inconsistent, thereby weakening the credibility of that testimony. Id. Depending on the entire record, one or more of these or other factors may be sufficient to justify the conclusion that an affidavit asserting information outside the record lacks credibility. Id. at 285.
 {¶ 28} Appellate review of a trial court's disposition of a petition for postconviction relief is a hybrid presenting mixed questions of law and fact. State v. Smith (Sept. 24, 1999), 11th Dist. No. 98-T-0097; State v. Akers (Sept. 9, 1999), 4th Dist. No. 98 CA 33.[1]
The trial court's factual findings will not be reversed unless they are against the manifest weight of the evidence. Judgments will not be reversed, as being against the manifest weight of the evidence if they are supported by some competent, credible evidence. Gerijo, Inc. v.Fairfield (1994), 70 Ohio St.3d 223, 226; C.E. Morris Co. v. FoleyConstr. Co. (1978), 54 Ohio St.2d 279, syllabus. Upon accepting such findings of fact, an appellate court then independently determines the propriety of the trial court's conclusions of law.
 {¶ 29} Appellant's first assignment of error states:
 {¶ 30} "THE TRIAL COURT ERRED BY DENYING APPELLANT'S CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL. THE FAILURE OF COUNSEL TO PRESENT AVAILABLE TRIAL AND MITIGATION EVIDENCE"
 {¶ 31} In order to prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that prejudice arose from counsel's performance. Strickland v. Washington (1984), 466 U.S. 668,687; State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus. A defendant must show that counsel acted unreasonably and that but for counsel's errors, there exists a reasonable probability that the result of the proceeding would have been different. Strickland,466 U.S. at 696; Bradley, 42 Ohio St.3d at paragraph three of the syllabus.
 {¶ 32} "Judicial scrutiny of counsel's performance is to be highly deferential, and reviewing courts must refrain from second-guessing the strategic decisions of trial counsel." State v.Carter (1995), 72 Ohio St.3d 545, 558. Rather, trial counsel is entitled to a strong presumption that all decisions fell within the wide range of reasonable, professional assistance. State v. Sallie (1998),81 Ohio St.3d 673, 675.
 Trial Phase Ineffectiveness A. Attorney James Gentile
 {¶ 33} Appellant's first claim of ineffectiveness is that one of his trial counsel was not certified pursuant to C.P.Sup.R. 20 to handle death cases during at least part of the proceedings. C.P.Sup.R. 20 sets forth qualifications for certification of appointed counsel for indigent defendants in a capital case. The rule states that two experienced counsel, certified pursuant to the standards set forth in the rule, be appointed for an indigent defendant.
 {¶ 34} Appellant's argument is without merit. Lack of certification does not automatically create a presumption that counsel has not provided effective assistance of counsel. State v. Misch (1995),101 Ohio App.3d 640, 651. This application of C.P.Sup.R. 20 is consistent with the long held view that the Rules of Superintendence for Courts of Common Pleas are guidelines for judges only and do not create substantive rights on the part of individual litigants. State v. Mahoney (1986),34 Ohio App.3d 114, 116-117; State v. Gettys (1976), 49 Ohio App.2d 241,243.
 {¶ 35} Moreover, appellant failed to adequately support this claim with evidence. In support, appellant attached to his petition what purports to be a one-page excerpt from a statewide list of attorneys eligible to be court-appointed counsel for indigent defendants in capital cases. (Exhibit 19.) The face page of the list indicated that it was released by the Supreme Court of Ohio in September 1996. The list includes some attorneys from Mahoning County but in no way indicates that it is a complete list. Furthermore, Atty. Gentile was not appointed to appellant's case until August 1996 and the case was not tried until May 1997.
B. Donald Meadows
 {¶ 36} Appellant argues that his trial counsel was ineffective for failing to conduct an adequate investigation relating to Donald Meadows (Meadows), an eyewitness to the shooting. Appellant takes issue with the fact that his trial counsel never interviewed Meadows and instead relied on police reports containing interviews with Meadows. Appellant argues that Meadows understated the level of alcohol he consumed the evening of the shooting and that he was not in a position to see the shooter from where he was located on the porch. In support of these claims, appellant points to two affidavits. The first is an affidavit of Mark Rooks, an investigator for the Office of the Ohio Public Defender. In it, he states that he interviewed Marilyn Conrad. He states that Conrad told him: (1) that on the night of the shooting, Meadows was drinking and smoking crack; (2) that Meadows was always at the apartment and that the apartment was a dope house; (3) that Meadows liked Hamlett and they were both crackheads; and (4) that she saw Hamlett on the back porch holding the baby on her arms right before the shooting. The second affidavit is that of Byron Wilcox. In it, he states that during appellant's trial he and his father spoke to Conrad and that she told them that what she said at trial was not what actually occurred.
 {¶ 37} These affidavits lack specificity and the threshold standard of cogency and do not rise to the level of demonstrating a constitutional violation. Moreover, in assessing the credibility of these affidavits based on the aforementioned factors, the trial court did not err in dismissing their credibility. The judge who reviewed appellant's postconviction relief petition was the same judge who presided over appellant's trial. Further, the affidavits not only rely on hearsay, they rely on double hearsay.
 {¶ 38} Appellant argues that his counsel were ineffective for failing to obtain the assistance of an eyewitness expert and a ballistics/crime scene reconstruction expert to aid in their examination of Meadows. In support, appellant points to two articles written by experts criticizing the reliability of eyewitness testimony.
 {¶ 39} These articles lack the threshold standard of cogency. They are only marginally significant and do not advance the petitioner's claim beyond mere hypothesis. The articles are written somewhat from an academic perspective and do not in any way address or evaluate the specific facts and circumstances surrounding appellant's case.
 {¶ 40} Furthermore, the Ohio Supreme Court has held that a defendant is not denied effective assistance by trial counsel's failure to obtain an expert to testify on the weakness of eyewitness testimony.State v. Madrigal (2000), 87 Ohio St.3d 378, 390. As in Madrigal, based on the record before the court in this case, "appellant's counsel were not ineffective so as to have precluded a fair trial or to have created an unreliable result. Appellant was represented by two experienced trial attorneys who presumably were aware of the issues involving the evidence of identification. Appellant's counsel evidently decided not to request the appointment of an eyewitness identification expert, choosing instead to rely on their cross-examination of the witnesses in order to impeach the eyewitnesses. In light of these circumstances, the errors alleged by appellant were neither so serious that his counsel were not functioning as `counsel' guaranteed by the Sixth Amendment, nor so serious that the result of his trial was rendered unreliable." Id.
 {¶ 41} Appellant argues that his counsel were ineffective for failing to obtain the assistance of a ballistics/crime scene reconstruction expert to aid in their examination of Meadows. Appellant argues that a reconstruction of the crime scene reveals that the muzzle flash from test firings of a 9-mm were insufficiently bright or of insufficient duration to permit an observer to identify the shooter.
 {¶ 42} The evidence appellant submitted in support lacks the threshold standard of cogency. It is only marginally significant and does not advance the petitioner's claim beyond mere hypothesis. There were significant differences between the reenactment and the actual shooting. The reenactment was performed at a different location, at a different time of the night, in a different month, and with no attempt to duplicate the weather or lighting conditions that existed on the evening of the shooting.
 {¶ 43} As with trial counsel's decision not to hire an eyewitness identification expert, appellant's counsel were not ineffective so as to have precluded a fair trial or to have created an unreliable result. Appellant was represented by two experienced trial attorneys who presumably were aware of the issues involving the evidence of identification. Appellant's counsel evidently decided not to request the appointment of a ballistics/crime scene reconstruction expert, choosing instead to rely on their cross-examination of the witnesses in order to impeach the eyewitnesses. In light of these circumstances, the errors alleged by appellant were neither so serious that his counsel were not functioning as "counsel" guaranteed by the Sixth Amendment, nor so serious that the result of his trial was rendered unreliable.
C. Others
 {¶ 44} Appellant argues that his trial counsel were ineffective for failing to interview and investigate the following witnesses before trial: Susan Hamlett, Marilyn Conrad, Damian Williams, Sam Lagese, and Edward Bunkley. In support of these claims, appellant attached additional affidavits from Rooks, an investigator for the Office of the Ohio Public Defender. Each of these affidavits relates information that lacks the threshold standard of cogency. Moreover, in assessing the credibility of these affidavits based on the aforementioned factors, the trial court did not err in dismissing their credibility. The judge who reviewed appellant's postconviction relief petition was the same judge who presided over appellant's trial. Further, the affidavits not only rely on hearsay, they rely on double hearsay.
 Mitigation Phase Ineffectiveness {¶ 45} Appellant argues that his trial counsel were ineffective in the preparation and presentation of the mitigation phase of his trial. He cites counsels' failure to call certain family and friends that would have testified to his history, character, and background. However, a review of their affidavits reveals that their testimony would have been repetitive and cumulative of that presented at trial. State v. Powell
(1993), 90 Ohio App.3d 260, 270.
 {¶ 46} Appellant also argues that trial counsel were ineffective for failing to call a particular mental health expert. A psychologist testified on behalf of appellant at mitigation. Again, the newly proffered evidence would have been cumulative of the information already presented during the penalty phase of the trial. See Powell, supra. Furthermore, even to the extent that appellant may now wish to expand upon the point, it is settled that a postconviction petition does not demonstrate ineffective assistance of counsel even when it presents a new expert opinion that is different from the theory used at trial. State v.Combs (1994), 100 Ohio App.3d 90, 103.
 {¶ 47} Accordingly, appellant's first assignment of error is without merit.
 {¶ 48} Appellant's second assignment of error states:
 {¶ 49} "THE TRIAL COURT ERRED BY DENYING APPELLANT'S FIFTH, SEVENTH, EIGHTH, TENTH, TWELFTH, THIRTEENTH, FIFTEENTH, SIXTEENTH, NINETEENTH, TWENTIETH, AND FORTY-FOURTH GROUNDS FOR RELIEF, WHICH SET FORTH VIOLATIONS OF THE RULE OF BRADY V. MARYLAND"
{¶ 50} Crim.R. 16(B) controls when determining what evidence the prosecution must turn over to a defendant during discovery. While this section of the rule contains seven subsections, only the following two are relevant to the present case:
 {¶ 51} "(B) Disclosure of evidence by the prosecuting attorney
 {¶ 52} "(1) Information subject to disclosure.
 {¶ 53} "* * *
 {¶ 54} "(c) Documents and tangible objects. Upon motion of the defendant the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, available to or within the possession, custody or control of the state, and which are material to the preparation of his defense, or are intended for use by the prosecuting attorney as evidence at the trial, or were obtained from or belong to the defendant.
 {¶ 55} "* * *
 {¶ 56} "(f) Disclosure of evidence favorable to defendant. Upon motion of the defendant before trial the court shall order the prosecuting attorney to disclose to counsel for the defendant all evidence, known or which may become known to the prosecuting attorney, favorable to the defendant and material either to guilt or punishment. * * *" (Emphasis added.)
 {¶ 57} In Brady v. Maryland (1963), 373 U.S. 83, the United States Supreme Court developed a rule of law, often referred to as the "Brady rule," which imposes upon a prosecutor a due process duty to disclose evidence favorable to the accused. Specifically, the court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. "Impeachment evidence, * * * as well as exculpatory evidence, falls within the Brady rule." United Statesv. Bagley (1985), 473 U.S. 667, 676. In subsequent decisions, the court defined the parameters of the Brady rule by expanding on the concept of materiality.
 {¶ 58} In Bagley, the court held that the materiality test requires "a reasonable probability" that, had the disclosure been made, the "result of the proceeding would have been different." Bagley,473 U.S. at 682. The court added, "A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id.
 {¶ 59} This concept of materiality was explored and narrowed further by the court in Kyles v. Whitley (1995), 514 U.S. 419. In Kyles,
the court elaborated at length on the Bagley definition of "materiality," stating:
 {¶ 60} "Four aspects of materiality under Bagley bear emphasis. Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal * * *. * * * Bagley's touchstone of materiality is a `reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A `reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression `undermines confidence in the outcome of the trial.' Bagley,473 U.S. at 678, 105 S.Ct. at 3381.
 {¶ 61} "The second aspect of Bagley materiality bearing emphasis here is that it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show aBrady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. * * *
 {¶ 62} "Third, we note that * * * once a reviewing court applyingBagley has found constitutional error there is no need for further harmless-error review. * * *
 {¶ 63} "The fourth and final aspect of Bagley materiality to be stressed here is its definition in terms of suppressed evidence considered collectively, not item by item. * * *" Kyles,514 U.S. at 434-36.
 {¶ 64} Appellant argues that appellee possessed evidence that contradicted Meadows testimony at trial. Appellant maintains that Meadows understated the level of his alcohol and drug consumption the night of the shooting and that he was in a position to see the shooter. Appellant also takes issue with the following witnesses: Susan Hamlett, Marilyn Conrad, Damian Williams, Sam Lagese, and Edward Bunkley. In support of these claims, appellant attached additional affidavits from Rooks, an investigator for the Office of the Ohio Public Defender. Each of these affidavits relates information that lacks the threshold standard of cogency. The information related in the affidavits highlights inconsistencies and contradictions in the witnesses' testimony which cannot be attributed to appellee. Moreover, in assessing the credibility of these affidavits based on the aforementioned factors, the trial court did not err in dismissing their credibility. The judge who reviewed appellant's postconviction relief petition was the same judge who presided over appellant's trial. Further, the affidavits not only rely on hearsay, they rely on double hearsay.
 {¶ 65} Next, appellant contends that appellee withheld information regarding Meadows' identification of him, that the photo identification was suggestive, and that mistakes resulted from the inexperience of the detectives. In support, appellant relies on the aforementioned affidavits which, as indicated, lack the threshold standard of cogency. Furthermore, any claim regarding Meadows identification of appellant should have been raised in his direct appeal and is therefore barred by res judicata.
 {¶ 66} Accordingly, appellant's second assignment of error is without merit.
 {¶ 67} Appellant's third assignment of error states:
 {¶ 68} "THE TRIAL COURT ERRED BY DENYING APPELLANT'S FIRST, SECOND, TWENTIETH, TWENTY-FIFTH, TWENTY-EIGHTH, TWENTY-NINTH, FORTY-THIRD, AND FORTY-SEVENTH GROUNDS FOR RELIEF, WHEN THESE CLAIMS ALLEGED SUBSTANTIAL CONSTITUTIONAL VIOLATIONS AND WERE SUPPORTED BY EVIDENCE DEHORS THE RECORD."
 A. Unconstitutional Penalty
 {¶ 69} Appellant argues that Ohio's death penalty scheme violates various constitutional provisions. Appellant raised similar arguments on direct appeal. Therefore, res judicata bars appellant from rearguing these points. To the extent that any arguments regarding the constitutionality of the death penalty were not specifically argued by appellant in his direct appeal, they could have been raised in that appeal and res judicata bars their presentation in post conviction proceedings. See State v. Reynolds (1997), 79 Ohio St.3d 158, 161. See, also, Statev. Palmer (Oct. 20, 1999), 7th Dist. No. 96 BA 70.
B. Race-Based Prosecution
 {¶ 70} Appellant argues that he was prosecuted because of his race. In support, appellant points to the affidavit of Rook wherein he relates an interview with Bunkley. Bunkley allegedly stated that the prosecutor came to him three days before appellant's trial and said, "Do you give a fuck if we fry your nigger or not?"
 {¶ 71} A prosecutor has broad discretion to enforce the criminal laws. However, the prosecutor's discretion is subject to constitutional constraints, including the equal protection clause. United States v.Armstrong (1996), 517 U.S. 456. In order to overcome the presumption that the prosecutor has not violated the defendant's equal protection rights, the defendant must demonstrate that the prosecutorial policy (1) had a discriminatory effect and (2) was motivated by a discriminatory purpose. Id.; State v. Flynt (1980), 63 Ohio St.2d 132. A defendant establishes that the prosecutorial policy had a racially discriminatory effect by showing that similarly situated individuals of a different race were not prosecuted. United State v. Armstrong, supra; State v. Flynt, supra.
 {¶ 72} Appellant failed to produce any evidence or demonstrate that similarly situated individuals of a different race were not prosecuted. Moreover, as already mentioned numerous times before, the affidavit upon which appellant relies in support of this claim fails the threshold of cogency and lacks credibility.
C. Weight of Evidence
 {¶ 73} Weight of the evidence is an argument that appellant could have raised on direct appeal. Therefore, those arguments are barred by res judicata. To the extent that appellant relies on evidence outside the record (i.e., the affidavits) to support those arguments, that evidence, as already indicated fails the threshold of cogency and lacks credibility.
D. Unreliable Eyewitness Testimony
 {¶ 74} Appellant avers that Meadows' eyewitness and identification testimony was so unreliable as to violate his rights of due process and confrontation. Appellant advanced these same arguments when he attributed the allegedly flawed testimony to ineffective assistance of counsel under his first assignment of error. For those same reasons, appellant's arguments here are without merit. The evidence relied upon fails the threshold of cogency and lacks credibility.
E. Waiver Of Speedy Trial Rights
 {¶ 75} Appellant claims that he did not make a knowing, voluntary, and intelligent waiver of his speedy trial rights. This is an argument that appellant could have raised on direct appeal. Therefore, those arguments are barred by res judicata. To the extent that appellant relies on evidence outside the record (i.e., the affidavits) to support those arguments, that evidence, as already indicated, fails the threshold of cogency and lacks credibility.
 {¶ 76} Accordingly, appellant's third assignment is without merit.
 {¶ 77} Appellant's fourth assignment of error states:
 {¶ 78} "THE APPLICATION OF THE DOCTRINE OF RES JUDICATA TO APPELLANT'S CLAIMS VIOLATED HIS RIGHTS AS GUARANTEED UNDER THE FIFTH, SIXTH, EIGHTH, NINTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION."
 {¶ 79} Appellant argues that the trial court erred in applying the doctrine of res judicata to twenty-five of his forty-nine claims for relief. Although appellant refers to twenty-five of the claims by listing them, he fails to explain how the trial court erred in applying res judicata to each specific claim.
 {¶ 80} In appellant's preceding assignments of error, an explanation is provided of why those claims raised on appeal are barred by the doctrine of res judicata and why to the limited extent they rely on evidence outside the record, that evidence fails a threshold standard of cogency and lacks credibility.
 {¶ 81} Accordingly, appellant's fourth assignment of error is without merit.
 {¶ 82} Appellant's fifth assignment of error states:
 {¶ 83} "IN APPELLANT'S CASE OHIO'S POSTCONVICTION PROCEDURES AFFORDED NEITHER AN ADEQUATE CORRECTIVE PROCESS NOR COMPLIED WITH DUE PROCESS AND EQUAL PROTECTION."
 {¶ 84} In Freeman v. Maxwell (1965), 4 Ohio St.2d 4,210 N.E.2d 885, the Ohio Supreme Court found the statutory procedure for postconviction relief to constitute an adequate remedy in the ordinary course of law for a prisoner to establish that a judgment of conviction has denied the prisoner his constitutional rights. Also, the Supreme Court has held that states have no constitutional obligation to provide postconviction remedies. Pennsylvania v. Finley (1987), 481 U.S. 551. The Ohio Supreme Court has also held that state collateral review is not a constitutional right, State v. Steffen (1994), 70 Ohio St.3d 399, and the petitioner receives no more rights than those granted by the post conviction statute. State v. Calhoun (1999), 86 Ohio St.3d 279.
 {¶ 85} Accordingly, appellant's fifth assignment of error is without merit.
 {¶ 86} Appellant's sixth assignment of error states:
 {¶ 87} "THE EFFECT OF THE CUMULATIVE ERROR DERIVED FROM APPELLANT'S SUBSTANTIVE CLAIMS MERIT REVERSAL OR REMAND FOR A NEW TRIAL AND SENTENCING HEARING OR AN ADEQUATE CORRECTIVE PROCESS PURSUANT [sic]"
 {¶ 88} Having discovered no errors, harmless or otherwise, the cumulative error doctrine is not applicable to this case. SeeState v. Garner (1995), 74 Ohio St.3d 49, 64.
 {¶ 89} Accordingly, appellant's sixth assignment of error is without merit.
 {¶ 90} The judgment of the trial court is hereby affirmed.
Waite, J., concurs.
DeGenaro, J., concurs.
[1] {¶ a} This court, as have others, have routinely stated that the trial court's decision with respect to a postconviction relief petition will not be reversed absent an abuse of discretion. However, such cases do not accurately state the standard of review applicable to petitions for postconviction relief. As the Eleventh District observed:
 {¶ b} "The adjudication of claims for relief predicated on alleged violations of the petitioner's constitutional rights is not a matter that falls exclusively within the trial court's discretion. For instance, the trial court may dismiss a claim for relief based on res judicata grounds. On review, the court of appeals must determine as a matter of law whether res judicata functioned as a bar to the claim for relief." Smith, supra, fn. 2.
 {¶ c} Similarly, in State v. McKinnon, 7th Dist. No. 99-CO-11, 2001-Ohio-3527, this court noted that an alleged Brady violation was to be reviewed under a due process analysis rather than the abuse of discretion analysis.